UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -v-                                No. 05 Cr. 19 (LTS)

BASHIR NOORZAI,

        Defendant.

FOR PUBLICATION

# OPINION AND ORDER

APPEARANCES:

MICHAEL J. GARCIA, UNITED STATES ATTORNEY, SOUTHERN DISTRICT OF NEW YORK

By:  Boyd M. Johnson, III, Esq.
       Amy Finzi, Esq.
       David A. O'Neil, Esq.
       Anjan Sahni, Esq.
       Jocelyn Strauber, Esq.

One Saint Andrew's Plaza
New York, New York 10007

IVAN STEPHAN FISHER, ESQ.
251 East 61st Street
New York, New York 10021

*Attorney for Defendant*

LAURA TAYLOR SWAIN, United States District Judge

Defendant Bashir Noorzai ("Mr. Noorzai" or "Defendant") is charged in a two-count Superseding Indictment with participating in a conspiracy to distribute heroin outside the United States while intending and knowing that the heroin would be imported into the United States, in violation of Title 21, United States Code, Sections 959, 960(a)(3), 960(b)(1)(A), and 963, and with participating in a conspiracy to distribute and possess with the intent to distribute one kilogram and more of heroin, in violation of Title 21, United States Code, Sections 812, 841(a)(1), 841(b)(1)(A), and 846.

Defendant has filed an Omnibus Motion requesting, inter alia, that the Court dismiss the Superseding Indictment based on the Government's assurances of safe passage allegedly made to Mr. Noorzai before he voluntarily traveled to the United States on April 13, 2005. Defendant also moves the Court to suppress all written and oral statements in the Government's possession that were made by Mr. Noorzai both before and after his entry into the United States.[1] Additionally, Defendant moves for dismissal of the Superseding Indictment as violative of 18 United States Code, Section 3501(c), and Federal Rule of Criminal Procedure 5(a), and for dismissal of the Superseding Indictment for lack of venue. In a Discovery Motion, Defendant seeks a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f), and an order striking alleged surplusage from the Superseding Indictment.

On February 7, 2008, the Court held oral argument on Defendant's Omnibus and

---

[1] The Government submits that it does not intend to offer statements made by Mr. Noorzai outside of the United States. (Gov't Opp. Br. 5.) Accordingly, the Court will not address the issue of whether statements made by Mr. Noorzai prior to his April 13, 2005, arrival in the United States were obtained in violation of any Fifth Amendment privilege against self-incrimination or Sixth Amendment right to counsel.

Discovery Motions.[2]  The parties made post-hearing submissions.

The Court has carefully considered all of the parties' voluminous submissions on Defendant's motions, as well the parties' arguments at the February 7, 2008, hearing.

For the following reasons, Defendant's Omnibus Motion is denied to the extent it seeks dismissal of the Superseding Indictment and suppression of Mr. Noorzai's written and oral statements made after his entry into the United States.  Defendant's request for an evidentiary hearing relating to the Government's alleged misconduct is denied.

BACKGROUND

Solely for purposes of the current motion practice, and except as otherwise specified, the following facts are undisputed.  Bashir Noorzai is a citizen of Afghanistan who is Chief of the Noorzai Tribe and its more than one million members.  (Noorzai Aff. ¶ 4.)  Throughout the 1990s and after the terrorist attacks of September 11, 2001, Mr. Noorzai had a series of contacts with U.S. officials.  (Id. ¶¶ 4-6, 36-40.)  Many of these contacts involved Mr. Noorzai providing information and turning over weaponry and munitions to U.S. personnel in order to further the United States mission in Afghanistan and promote stability in the region.  (Id. ¶¶ 36-40.)  Most of Mr. Noorzai's contacts with U.S. officials during this period were

---

[2] At the February 7, 2008, hearing Mr. Noorzai withdrew those aspects of his motions seeking: (1) dismissal of the Superseding Indictment as violative of 18 United States Code, Section 3501(c) and Federal Rule of Criminal Procedure 5(a); (2) dismissal of the Superseding Indictment for lack of venue; and (3) a bill of particulars.  (See February 7, 2008, Tr. at 4, 35.)  Defendant's motion for an order striking alleged surplusage from the Superseding Indictment is denied as premature, without prejudice to renewal, at a later stage in the proceedings.  (See id. at 35.)

cooperative, although he was detained for six days by the U.S. government in 2001 at the Kandahar Airport in Afghanistan. (Id. ¶ 110.)

Sometime in 2003, illegal payments were made by U.S. officials and/or agents of U.S. officials to foreign officials in order to help U.S. officials locate Mr. Noorzai. (Aff. of Michael Patrick Jost at 3; Aff. of Ivan S. Fisher ¶ 3.) In 2004, Mr. Noorzai was informed by two of his friends that American representatives wanted to meet him in Dubai. Mr. Noorzai alleges that the U.S. officials were able to make contact (through Mr. Noorzai's two friends) only by making illegal bribe payments to foreign officials. (Noorzai Aff ¶ 58; Aff. of Ivan S. Fisher ¶ 11.) In August 2004, Mr. Noozai traveled to Dubai and began a series of meetings with two U.S. government representatives named "Mike" and "Brian." Mike stated that he and Brian were working on a project "studying and ascertaining the financial support of the terrorists [sic] organizations in Afghanistan." (Noorzai Aff. ¶¶ 62-63.) Mike informed Mr. Noorzai that the project "had nothing to do with arresting anyone or apprehending anyone." (Id. ¶ 63.) Mr. Noorzai expressed a willingness to work with the U.S. government and advised Mike and Brian that he was willing to travel to the United States if it would be a "useful trip." (Id. ¶ 70.) Mr. Noorzai was advised that he would be granted safe passage to and from the United States. (Id. ¶¶ 69-70.) During a subsequent meeting, and although Mike and Brian assured Mr. Noozai that their project "was not a counter narcotics project," Mr. Noorzai was questioned about the opium trade in Afghanistan, including reports that Mr. Noorzai was involved in the trade. (Id. ¶ 85.) Throughout the series of meetings in Dubai, Mr. Noorzai denied any involvement in the narcotics business. (Id. ¶¶ 98, 120.)

At a meeting on August 9, 2004, Mike and Brian informed Mr. Noorzai that "the

official posture of the United States government would no longer be one seeking [his] apprehension for any reason, political or otherwise." (Id. ¶ 124.) On September 16, 2004, at a meeting in Peshawar, Pakistan, Mike and Brian promised Mr. Noorzai that he would be "allowed to come to the United States, meet with important government officials, and then return to Pakistan." (Id. ¶ 135.)

On January 6, 2005, an arrest warrant was issued for Mr. Noorzai and, on April 7, 2005, prior to his arrival in the United States, the Government filed the sealed Superseding Indictment against him.

On April 13, 2005, Mr. Noorzai and two of his associates arrived in New York City and were met by Drug Enforcement Administration ("DEA") Special Agent Patrick Hamlette and other agents. (Affirmation of Patrick Hamlette, November 9, 2007 ("Hamlette Aff.") ¶ 4.) Agent Hamlette identified himself as an employee of the U.S. Department of Justice. (Id.) Agent Hamlette and the other agents transported Mr. Noorzai to the Embassy Suites Hotel in lower Manhattan. During the journey to the hotel, Mr. Noorzai was advised of his Miranda rights through a translator. (Id. ¶ 5.) Mr. Noorzai told the agents that the reason he had decided to travel to the United States was to meet with U.S. representatives and speak about issues relating to the future of Afghanistan. (Id.)

Over an eleven-day period from April 13, 2005, to April 23, 2005, Mr. Noorzai was questioned in his hotel room by Agent Hamlette with the assistance of a translator. Mr. Noorzai was advised of his Miranda rights prior to each conversation. (Id. ¶¶ 12, 16, 20, 25, 29, 32, 36, 42, 48.) Mr. Noorzai never asked Agent Hamlette, or any other agent, questions about his Miranda rights, nor did he indicate that he did not understand his rights, or seek assurances about

the way in which statements he made could be used. (Id.) The conversations were consensual in tone: Mr. Noorzai was free to move about the room; answers were not demanded to particular questions; Mr. Noorzai maintained unlimited access to a telephone, as well as a laptop computer with internet service; and he was permitted to maintain possession of his passport as well as his other personal effects. (Id. ¶ 6.) At no time in Mr. Noorzai's presence did Agent Hamlette, or any other agent, display a weapon. (Id. ¶ 7.) Moreover, Mr. Noorzai was permitted to sleep alone in his hotel room, to make telephone calls abroad to his relatives, and to determine when he was ready to meet with agents. (Id. ¶¶ 7, 43, 23.) On several occasions, Mr. Noorzai declined the agents' requests to meet. (Id. ¶¶ 15, 23.)

The conversations between April 13, 2005, through April 23, 2005, covered a broad range of topics, including the location of various individuals in Afghanistan and Pakistan, the land Mr. Noorzai owned in Afghanistan, the structure of the Taliban, the relationship between the Taliban and officials from Saudi Arabia and the United Arab Emirates, and the opium trade in Afghanistan. Mr. Noorzai made written statements. (Id. ¶¶ 5, 12, 16, 25, 29; Id. at Exs. 1, 2.) Mr. Noorzai contends that, during his questioning, he was unaware that he was being investigated or that he was in any legal trouble. Rather, Mr. Noorzai asserts, he believed that his statements were in furtherance of productive assistance to the Government. (Tr. 6-7.)

After concluding that Mr. Noorzai had not been completely truthful over the eleven-day questioning period, Agent Hamlette advised Mr. Noorzai of the outstanding arrest warrant for violating U.S. narcotics laws and placed Mr. Noorzai under arrest. (Hamlette Aff. ¶ 49.) During his questioning of Mr. Noorzai between April 13 and April 23, 2005, Agent Hamlette never advised Mr. Noorzai about the Superseding Indictment, nor did he disclose the

existence of the arrest warrant until Mr. Noorzai's arrest on April 23, 2005.

Mr. Noorzai signed a waiver of speedy presentment form and was transported to the DEA headquarters in New York.[3] (Id. at Ex. 3.) Questioning of Mr. Noorzai ceased after his processing at the DEA because Mr. Noorzai stated that he did not want to say anything without a lawyer. (Id. ¶ 52.) On April 24, 2005, while in custody at the DEA headquarters, Mr. Noorzai resumed his conversation with Agent Hamlette. (Id. ¶ 53.) Agent Hamlette again advised Mr. Noorzai of his Miranda rights. (Id.) Mr. Noorzai responded that he understood his rights and he signed a Miranda waiver form. (Id. at Ex. 4.) Mr. Noorzai made various statements about the heroin trade in Afghanistan before again requesting an attorney. (Id. ¶ 54.) Once Mr. Noorzai made another request for counsel, Agent Hamlette ceased speaking with Mr. Noorzai and Mr. Noorzai was returned to his holding cell. (Id.)

In his January 28, 2008, response to the Government's sur-reply, and in his counsel's February 19, 2008, letter to the Court, Mr. Noorzai asserts that a member of the Government prosecution team made false representations to the Court to the effect that Mike and Brian acted without the knowledge and authorization of U.S. officials when they made promises of non-arrest to Mr. Noorzai. Mr. Noorzai also submits that the Government misled the Court by suggesting that the prosecutors' initial contacts with Mike and Brian were made later than they actually were, and by suggesting that Mike and Brian were not authorized to bind the Government to promises of non-arrest and safe passage. The Government disputes these allegations and represented on the record that, during the course of its investigation, prosecutors

---

[3] Because April 23, 2005, was a Saturday, and federal court in Manhattan was closed, the DEA held Mr. Noorzai at its headquarters until his presentment on Monday, April 25, 2005.

learned of certain assurances of non-arrest that Mike and Brian made to Mr. Noorzai. The Government submits that, once the prosecutors learned of Mike and Brian's promises of non-arrest, it promptly instructed Mike and Brian that no promises of that nature should be made in connection with Mr. Noorzai's April 2005 travel to the United States. (See Gov't Br., Jan. 30, 2008, at 3 n. 2.) Nonetheless, and consistent with the Government's concessions for purposes of this motion practice, the Court assumes for purposes of its analysis that Mike and Brian were authorized to, and did, make representations of safe passage to Mr. Noorzai in connection with the April 2005 trip. (See Tr. at 21.)

DISCUSSION

In his Omnibus Motion to dismiss the Superseding Indictment, Mr. Noorzai argues principally that the Due Process Clause of the Fourteenth and Fifth Amendments to the Constitution of the United States requires the Court to dismiss the Superseding Indictment because Mr. Noorzai was lured to the United States under false promises that he would not be arrested. Mr. Noorzai also argues that statements he made after his arrival in the United States must be suppressed because he did not knowingly and intelligently waive his Sixth Amendment right to counsel.

Application to Dismiss the Superseding Indictment

Mr. Noorzai argues that due process principles of fundamental fairness require the Court to dismiss the Superseding Indictment because Mr. Noorzai was lured to the United States on the basis of false promises that he would not be arrested by U.S. officials. Mr. Noorzai

also argues that, although he was never promised an immunity agreement, this Court should enforce the no-arrest promise by dismissing the Superseding Indictment and barring further prosecution of the charges therein. In support of the latter argument, the defense cites decisions holding that promises of immunity must be enforced under certain circumstances. See, e.g., United States v. Flemmi, 225 F.3d 78, 84 (1st Cir. 2000) (holding "[a] formal grant of use immunity . . . must be honored . . . [and] [a] prosecutor's promise, accepted by a defendant in consideration of a change of plea, likewise must be honored"). However, where no promise of immunity was proffered and the defendant merely complains of the method by which his presence in the jurisdiction was obtained, there is generally no bar to the prosecution.

"[The Supreme] Court has never departed from the rule announced in Ker v. Illinois, 119 U.S. 436, 444 [1886] (7 S. Ct. 225, 229, 30 L.Ed. 421), that the power of a court to try a person for [a] crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.' . . . [D]ue process of law is satisfied when one present in court is convicted of [a] crime after being fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards." Frisbie v. Collins, 342 U.S. 519, 522 (1952). Under the so-called Ker-Frisbie rule, the constitutional due process requirement is limited to a guarantee of a fair trial, regardless of the method by which jurisdiction was obtained over the defendant. United States v. Toscanino, 500 F.2d 267, 272 (2d Cir. 1974), *petition for hearing en banc denied*, 500 F.2d 267 (2d Cir 1974); see also United States v. Alvarez-Machain, 504 U.S. 655, 669-70 (1992) ("rule of Ker v. Illinois" held "fully applicable" to case in which person was forcibly abducted from Mexico even if abduction was "shocking" and possibly in violation of general principles of international law).

In Toscanino, a panel of the Second Circuit considered a due process challenge to the prosecution of an individual who alleged that he had been kidnapped forcibly by Uruguayan police acting as paid agents of the U.S. government, knocked unconscious with a gun in front of his pregnant wife, forced to go without food and sleep for days at a time and to walk up and down a hallway for hours, suffering beatings if he fell, pinched with metal instruments, that his eyes had been flushed with alcohol and other fluids forced into a body cavity, that he had been administered powerful electric shocks via electrodes attached to his earlobes, toes and genitals, and that he was thereafter drugged and flown to the United States. Toscanino, 500 F.2d at 270; United States ex rel. Lujan v. Gengler, 510 F.2d 62, 64 (2d Cir. 1975). The case was remanded for possible evidentiary hearings on the defendant's allegations (which the district court, relying on the Ker-Frisbie doctrine, had held immaterial to the question of the validity of the indictment), the panel stating that "[i]f the charges of government misconduct in kidnapping Toscanino and forcibly bringing him to the United States should be sustained . . . [he] would, as a matter of due process, [be] entitle[d] to some relief." Toscanino, 500 F.2d at 275-76.

The Toscanino panel questioned the continuing vitality of Ker-Frisbie's limitation of the due process inquiry to the integrity of the process in the American court once jurisdiction had been obtained over the defendant, discussing the Supreme Court's decision in Mapp v. Ohio, 367 U.S. 643 (1961), and the development of the exclusionary rule and, most notably, Rochin v. California, 342 U.S. 165 (1952), a decision rendered shortly before Frisbie, in which the Supreme Court "broadened its interpretation of due process to set aside for the first time a state court conviction obtained through police brutality." Toscanino, 500 F.2d at 273. The police in Rochin had obtained the physical evidence upon which the drug conviction in that case rested by

forcing a tube and emetic solution into the defendant's body and thereby inducing the defendant to vomit up capsules of narcotics that he had swallowed, conduct that the Rochin majority characterized as of a type that "'shocks the conscience.'" See Toscanino, 500 F.2d at 273 (quoting Rochin, 342 U.S. at 172-173).

Less than a year after the Toscanino decision the Circuit, again confronting an argument that an illegal abduction warranted dismissal of an indictment, made clear the limitations of the Toscanino holdings and analysis:

> In recognizing that Ker and Frisbie no longer provided a carte blanche to government agents bringing defendants from abroad to the United States by the use of torture, brutality and similar outrageous conduct, we did not intend to suggest that any irregularity in the circumstances of a defendant's arrival in the jurisdiction would vitiate the proceedings of the criminal court.

Lujan, 510 F.2d at 65.

In Lujan, the Second Circuit declined to extend Toscanino's more expansive view of due process to a situation in which there was no "allegation of that complex of shocking governmental conduct sufficient to convert an abduction which is simply illegal into one which sinks to a violation of due process." Id. Notably, the Second Circuit held in Lujan that, "absent a set of incidents like that in Toscanino, not every violation by prosecution or police is so egregious that Rochin and its progeny requires nullification of the indictment." Id. at 66; see Rochin, 342 U.S. at 172-73. Mr. Lujan's allegation that he was abducted by government agents was held insufficient to vitiate his criminal prosecution because, among other things, there was no allegation of "torture, terror or custodial interrogation of any kind." Id. at 66; see also id. at 69 (concurring opinion) (noting that under "the law of this Circuit," Toscanino applies where "a foreign national is abducted or kidnapped from outside of the United States and is *forcibly*

brought into this country by United States agents by means of *torture, brutality or similar physical abuse*") (emphasis added).

Subsequent decisions of the Circuit have made it clear that its recognition of an exception to the Ker-Frisbie rule is essentially limited to the extreme facts of Toscanino, or cases which demonstrate an analogous invasion of a defendant's bodily integrity and indicate government conduct of a most shocking and outrageous character. See United States v. Reed, 639 F.2d 896, 901-02 (2d Cir. 1981) (holding the Toscanino exception inapplicable where defendant alleged only that government agents "enticed" him "under false pretenses and with the use of a revolver and threatening language"). The Court has found no decisions applying Toscanino to question the viability of a prosecution on the basis of non-violent official conduct. Moreover, there is no authority holding that obtaining a person's presence by deceiving them as to the purpose of a law enforcement encounter is sufficient to vitiate a prosecution. Such a principle would be facially inconsistent with the Ker-Frisbie rule in any event, which holds that a person can be abducted – even brought forcibly into the encounter – without triggering a due process violation. See Lujan, 510 F.2d at 69.

Thus, notwithstanding Mr. Noorzai's assertions that this case "involves the exceptional level of impropriety under which the principles of due process require dismissal of the indictment" (Def. Br., Jan. 28, 2008, 5), Defendant's allegations of deceit and government misconduct, which do not implicate physical abuse of any kind, are insufficient to provide any basis for refusal to entertain this prosecution on due process grounds. As the Ker-Frisbie line of cases makes clear, due process is not normally addressed by dismissal of an indictment on the basis of the conduct used to secure the defendant's presence to answer the charges. Rather, due

process

> is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will.

Frisbie, 342 U.S. at 522. Indeed, the Second Circuit has refused to apply Toscanino to a case raising similar allegations in a situation far more egregious than the facts with which the Court is currently presented. See Reed, 639 F.2d at 901-02 (holding that due process was not violated where the defendant alleged only that government agents "enticed" him "under false pretenses and with the use of a revolver and threatening language"). No evidentiary hearing is required because the Court has, based on the Government's concessions for purposes of this motion practice, construed Mr. Noorzai's material allegations of misconduct as true for purposes of analyzing his due process claim.

Furthermore, while the Government concedes that promises of non-arrest were made to Mr. Noorzai, such promises do not entitle Mr. Noorzai to dismissal of the Superseding Indictment. The decisions that have applied contract principles to require the enforcement of government promises in the context of prosecutions have done so in situations in which a defendant gave up a constitutional right in reliance on the promise, such as situations involving the revelation of information in connection with immunity agreements or agreements not to prosecute. See United States v. Pelletier, 898 F.2d 297, 302 (2d Cir. 1990) (holding that due process "requires that the government adhere to the terms of any plea bargain or immunity agreement it makes"). Here, since Mr. Noorzai concedes that he was neither promised immunity nor, for example, induced to plead guilty or to waive his right against self-incrimination, he was

not denied due process by the Government's refusal to uphold its promises in that he did not give up a constitutional right in reliance on the promises of non-arrest. Mr. Noorzai does not have a constitutional right to not be a target of a criminal prosecution. Furthermore, the alleged promises, even if made by authorized officials, were not ones that by their terms negated the possibility of prosecution.[4]

           Accordingly, Defendant's application to dismiss the Superseding Indictment is denied.

Application to Suppress Mr. Noorzai's Oral and Written Statements

           Mr. Noorzai contends that, because he was not informed before being questioned at the Embassy Suites Hotel in New York between April 13 through 23, 2005, that he was subject to any allegation of wrongdoing – specifically, he complains that he was neither informed that he was under arrest nor that an indictment against him was pending – he was "in no position to make a knowing and intelligent decision to waive his [Sixth Amendment] right to counsel." (Def. Reply, Dec. 3, 2007, 7.) Based on this reasoning, he contends that the statements that he made during that period should be suppressed, even though there is no dispute that he was administered, and understood, the <u>Miranda</u> warnings[5] prior to each interrogation session at the

---

    [4]    As explained above, the due process issue primarily focuses on a defendant's full opportunity to defend himself on the merits of the charges. False assurances of non-arrest do not compromise Mr. Noorzai's ability to defend himself at trial.

    [5]    In <u>Miranda v. Arizona</u>, 384 U.S. 436, 479 (1966), the Supreme Court held that, before a custodial interrogation, the person being questioned "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney and that if he cannot afford an attorney one will be appointed for him

hotel.

It is well established, however, that a defendant who is provided with <u>Miranda</u> warnings during post-indictment questioning "has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." <u>Patterson v. Illinois</u>, 487 U.S. 285, 296 (1988). This is so even when the defendant does not know that he has been indicted. <u>United States v. Charria</u>, 919 F.2d 842, 848 (2d Cir. 1990). Because he knows that any statement could be used against him in subsequent criminal proceedings, a defendant is considered to be fully aware of "the ultimate adverse consequence [that he] could have suffered by virtue of his choice to make uncounseled admissions to the authorities." <u>Patterson</u>, 487 U.S. at 293-94.

In <u>Patterson</u>, the Supreme Court announced a "pragmatic" approach to the assessment of whether a defendant has been provided with sufficient information to support a knowing and voluntary waiver of the right to counsel in the particular situation.

> Factors that bear on the adequacy of a sixth amendment waiver include: the usefulness of counsel to the accused at the particular proceeding, and the dangers to the accused of proceeding without counsel. An accused's waiver of his right to counsel is "knowing" when he made aware of these basic facts.

<u>Charria</u>, 919 F.2d at 847. The <u>Patterson</u> Court held that:

> Because the role of counsel at questioning is relatively simple and limited, we see no problem in having a waiver procedure at that stage which is likewise simple and limited. So long as the accused is made aware of the dangers and disadvantages of self-representation during post-indictment questioning, by the use of <u>Miranda</u> warnings, his waiver of his Sixth Amendment right to counsel at such questioning is knowing and intelligent.

<u>Id.</u> at 300 (internal quotation marks omitted); <u>cf.</u> <u>United States v. Yunis</u>, 859 F.2d 953, 964 (D.C.

---

prior to any questioning if he so desires."

Cir. 1988) (holding that although "an individual's foreign background seems especially pertinent to the knowing quality of a waiver . . . [the Supreme Court] has never embraced the theory that a defendant's ignorance of the *full* consequences of his decisions vitiates their voluntariness") (emphasis in original) (citation omitted).

Despite the clear focus of both the Supreme Court and the Second Circuit on knowledge of the nature of the right to counsel and the limited function of counsel in the interrogation context, Defendant seeks to add an information requirement – notice that the person is under arrest or other formal accusation – to the Miranda warning requirement articulated in Patterson and Charria. Mr. Noorzai's argument in this regard is based principally on the Second Circuit's statement in Charria that, "[o]nce an accused understands that he is under arrest and, after receiving the Miranda warnings, understands his right[s] . . . , he is fully apprised of the information needed to make a knowing waiver of the sixth amendment right." Charria, 929 F.2d at 848. According to the defense, "[b]ecause Charria was aware that he was under arrest, he was in a position to understand the purpose that a lawyer would serve and the form of assistance a lawyer would be able to provide, and could thus make a knowing and intelligent determination to waive the right to such assistance." (Def. Reply, Dec. 3, 2007, 7.) The Charria Court's own statement of the issue presented in that case makes it clear, however, that information as to a defendant's arrestee status was not integral to the holding in that case. Rather, Charria addressed "the sole issue . . . [of] whether an indicted defendant who has been given Miranda warnings *but not informed of the indictment against him* may waive the right to counsel when consenting to custodial questioning and a search of his home." Id. at 846 (emphasis supplied). The fact that Mr. Charria had also been informed that he was under arrest was not dispositive of the Sixth

Amendment waiver question as the Second Circuit framed it. Nor is such a requirement consistent with the Supreme Court's analysis in Patterson. Indeed, the Patterson majority rejected arguments that the potential functions of a lawyer beyond mere advice as to whether to respond to questions required warnings more extensive than those laid out in Miranda for a valid post-indictment waiver of the right to counsel in connection with interrogation. See Patterson, 487 U.S. at 307-8 (Stevens, J., dissenting).

   Mr. Noorzai's factual proffers, taken as true for purposes of this motion practice and construed in the light most favorable to him, are also insufficient to raise any question unique to this case as to whether he was in a position to appreciate the clear import of the Miranda warning's notice that his statements could be used *against* him in a court of law. There is no dispute that, prior to and during the agents' questioning of Mr. Noorzai at the hotel, the warnings were administered repeatedly. (Id. ¶¶ 5, 12, 16, 25, 29; id. at Exs. 1, 2.) Mr. Noorzai does not allege that he did not understand the warnings or the nature of his rights. At the time Mr. Noorzai was questioned in the hotel, the value of counsel would have been limited to merely advising Mr. Noorzai not to speak to the agents. See Patterson, 487 U.S. at 298-99. Under Patterson's pragmatic approach, the information provided to Mr. Noorzai prior to his waiver was adequate to support his knowing and intelligent waiver of the right to counsel in connection with the questioning. The perils of self-representation and/or making statements to government agents during Mr. Noorzai's questioning were "simple, obvious and intuitive" in light of the Miranda warnings themselves, and the context in which Mr. Noorzai made the statements – specifically, one where Mr. Noorzai was questioned at length by government officials about his involvement in illegal criminal activity. Charria, 919 F.2d at 848. The fact that Mr. Noorzai was not advised

that he was under arrest or informed that he was under indictment when he was read his <u>Miranda</u> rights does not undermine the validity of his Sixth Amendment waiver.

The record makes clear Mr. Noorzai's understanding of the potential gravity of the situation and the events leading up to his travel to the United States. Mr. Noorzai knew U.S. officials had allegedly detained the former Taliban Foreign Minister for two years in 2002. Mr. Noorzai himself had been detained at the Kandahar Airport in Afghanistan for six days in 2001. Mr. Noorzai had himself expressed concerns about his safe passage to the United States "and the possibility that the [U.S.] agents were trying to set [him] up to be apprehended and jailed . . . ." (Noorzai Aff. ¶¶ 51-52, 110, 135.) Additionally, despite his belief that he was on a diplomatic mission, Mr. Noorzai understood that he was dealing strictly with Department of Justice employees – not persons purporting to be U.S. diplomats – in New York. The agents who met with him questioned him about his involvement with the narcotics trade in Afghanistan.

The record also makes it plain that, notwithstanding his diplomatic ambitions, Mr. Noorzai was in fact concerned enough about potential criminal exposure that he inquired about it before he arrived in the United States. Although Mr. Noorzai proffers that he was told that the "official posture of the United States government would no longer be one seeking [his] apprehension," he makes no allegation that U.S. officials informed him that he was not suspected of any criminal wrongdoing or that he would never be prosecuted by the United States. Thus the record, viewed in the light most favorable to Defendant, does not bear out the notion that he was unaware of the potential for adverse consequences arising from his decision to waive his right to counsel in connection with his conversations with U.S. government officials.

The critical teaching of <u>Patterson</u> and <u>Charria</u> is that, during questioning by law

enforcement officials, an indicted defendant need not be advised of the Government's pending charge against him, provided that he is advised of his Miranda rights.  Miranda warnings are sufficient because they apprise a person of the specific rights he has, and must make decisions about, at the time.  See Patterson, 487 U.S. at 293-94.  Here, the undisputed record establishes that the Government satisfied its obligation of advising Mr. Noorzai of his Miranda rights.  Mr. Noorzai understood those rights, which were repeated prior to each conversation, and the consequences of waiving them.  Under the facts as presented, the Government had no responsibility to provide Mr. Noorzai with any additional information concerning the existence or status of charges against him prior to his April 23, 2005, arrest in order to enable Mr. Noorzai to make his knowing, voluntary and valid waiver of his Sixth Amendment right to counsel.

Accordingly, Defendant's Omnibus Motion is denied insofar as it seeks the suppression of Mr. Noorzai's written and oral statements made after his entry into the United States.

CONCLUSION

Accordingly, Defendant's Omnibus Motion is resolved as follows: (1) Defendant's application to dismiss the Superseding Indictment is denied; (2) Defendant's application to suppress Mr. Noorzai's pre- and post-arrest statements is denied; (3) Defendant's application to dismiss the Superseding Indictment as violative of 18 United States Code, Section 3501(c) and Federal Rule of Criminal Procedure 5(a) is withdrawn; and (4) Defendant's application to dismiss the Superseding Indictment for lack of venue is withdrawn.  Defendant's Discovery Motion is resolved as follows: (1) Defendant's application for a bill of particulars is

withdrawn; and (2) Defendant's application for an order striking alleged surplusage from the Superseding Indictment is denied as premature without prejudice to renewal at a later stage in the proceedings.

This Opinion and Order resolves docket entry nos. 64 and 70. The Court will hold a pre-trial conference on April 17, 2008, at 2:30 p.m.

SO ORDERED.

Dated: New York, New York
April 9, 2008

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge